IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MITEK CORPATION, an Illinois corporation, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | CASE NO. |
| BRAD DIEDRICH and AFCO, Inc., d/b/a MEMPHIS CAR AUDIO, a Tennessee corporation | ) ) ) ) | Judge |
| Defendants. | ) ) | |

## COMPLAINT

As and for its complaint against Defendants Brad Diedrich ("Diedrich") and AFCO, Inc. d/b/a Memphis Car Audio ("Memphis"), Plaintiff Mitek Corporation ("Mitek") states as follows:

**Allegations Common to All Counts**

**A.   The Parties**

1. Mitek is an Illinois corporation, with its principal places of business in Winslow, Illinois and Phoenix, Arizona. Mitek is a citizen of Illinois and Arizona.

2. Mitek designs, manufactures, engineers and sells high performance audio equipment for commercial, mobile, residential, marine and motorsports use. MTX audio is a division of Mitek and a brand sold by Mitek.

3. MTX's engineers and design teams focus on, design and create audio products and have been responsible for dozens of patents and innovations, including Adaptive Class D amplifier technology, Smart Engage auto turn on circuitry, and the JackHammer Superwoofer, the largest production subwoofer in the world. MTX continuously attempts to develop new products. In 2017, MTX was developing a digital signal processing amplifier ("DSP

1

amplifier"). The DSP amplifier makes integration of aftermarket and original equipment manufacturer (OEM) parts easier, which in turn enhances and/or improves the overall sound produced by consumer audio equipment. There are numerous benefits derived from using the DSP amplifier. First, a DSP amplifier can replace an OEM amplifier while still providing similar or even better sound quality. Second, the DSP amplifier gives the user significantly more ability to fine tune and adjust their sound system. Third, the DSP amplifier can have a self-adjustment feature that regulates the output to the speakers automatically in order to optimize the sound inside a motor vehicle depending on the level of other noise such as exterior road noise.

4. Defendant Diedrich is a Wisconsin citizen who resides in Oregon, Wisconsin. Diedrich was employed by Mitek from on or around May 2003 to September 22, 2017. As of September 2017, Diedrich was Mitek's Senior Engineering Manager, the highest engineering position within Mitek and a position he had held for more than ten years prior to his resignation.

5. Diedrich was hired by Mitek following his graduation from college as an Acoustic Engineer. All of the information, training, and knowledge acquired by Diedrich regarding Mitek's industry were a direct result of Diedrich's employment with Mitek. Following Diedrich's resignation from Mitek, he became, and still is employed by Defendant Memphis as its Director of Product Development. (*See* B. Diedrich Linkedin Profile, attached hereto as Exhibit A.)

6. Defendant Memphis is a Tennessee Corporation with its principal place of business located in Memphis, Tennessee. Memphis is a citizen of Tennessee.

7. Memphis is engaged in the business of designing, manufacturing, engineering, and selling audio equipment for commercial, mobile, residential, marine and motorsports use. As such, Memphis is a direct competitor of Mitek.

**B.     Jurisdiction and Venue**

8.     This Court has original jurisdiction over this action by virtue of 28 U.S.C. §1331, as this cause of action arises under the Defend Trade Secrets Act, 18 U.S.C. §1831 *et. seq.* ("DTSA"). Moreover, the District Courts of the United States have original jurisdiction over civil actions brought under the Defend Trade Secrets Act pursuant to 18 U.S.C. § 1836(c).

9.     This Court has supplemental jurisdiction over claims arising under state law pursuant to 28 U.S.C. §1367(a), as the claims at issue are so closely related that they form part of the same case or controversy.

10.     Defendant Diedrich is subject to personal jurisdiction in this Court by virtue of among other things, doing business in Illinois, previously being employed in Illinois, causing harm in Illinois by acts or omissions done both inside and outside of Illinois, entering into a valid and enforceable Illinois contract out of which this litigation arose, and a valid and enforceable venue selection clause.

11.     Defendant Memphis is subject to personal jurisdiction in this Court by virtue of among other things, doing business in Illinois (several of Memphis' dealers are located in Illinois), causing harm in Illinois by acts or omissions done both inside and outside of Illinois, marketing their goods and services in Illinois, and otherwise having substantial contact with Illinois.

12.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) as a substantial part of the events or omissions giving rise to this claim occurred in this district. Further, the trade secrets, confidential information, and intellectual property at issue exist in this district, where Mitek resides and conducts business. In addition, the injury complained of is being inflicted in this district.

13.     Jurisdiction and venue are also proper in this Court as to Defendant Diedrich pursuant to a valid choice of law clause contained in the "Employee Confidentiality and Non-

Solicitation Agreement" entered into between Diedrich and Mitek, a true and correct copy of which is attached hereto as Exhibit B. That provision provides, in relevant part: "[t]he interpretation and performance of this Agreement will be governed by the laws of the State of Illinois, without regard to principals of conflicts of laws."

### C. Mitek's Employment of Diedrich

14. From May 2003 to September 22, 2017, Mitek employed Diedrich in various positions at the company. From December 2007 until the time of his departure, Diedrich was a Senior Engineering Manager at Mitek, the highest level of engineer at Mitek.

15. As a Senior Engineering Manager, Diedrich had access to all of MTX's current products and future product plans, including but not limited to blueprints, drawings, designs, and patents. Diedrich regularly participated in product design and development meetings in which current and future MTX products were discussed.

16. In addition, Diedrich's duties included, among other things, (a) strategic planning and project execution deliverables, including technical scope of supply, design specifications, cost estimates, testing protocol, and commissioning procedures in order to provide proper technical support quickly and efficiently; (b) identifying, leading, and selecting appropriate development groups for high-profile projects; (c) providing rapid and cost effective responses to technical issues; (d) maintaining key relationships with suppliers, customers, and other external partners, including management of multiple facilities in China. (*See* Exhibit A, Diedrich's Linkedin Profile).

17. Throughout his employment with Mitek, Diedrich signed several confidentiality and non-disclosure agreements through which he agreed to protect and not disclose Mitek's confidential information and trade secrets, the most recent of which was an agreement entitled "Employee Confidentiality and Non-Solicitation Agreement" ("Agreement"). That Agreement was signed on April 4, 2016 (Exhibit B). In exchange for his promise to comply with the

4

provisions of the Agreement, Diedrich received both continued employment and a salary increase in the amount of $2,412.69.

    18.    The Agreement states, in relevant part:

§ 1.    **Ownership of Inventions**

§1.1    All ideas, designs, discoveries, developments, concepts, techniques or improvements ("Inventions") conceived or reduced to practice by the Employee, alone, or with others, during the Employee's employment with the Company, or within ninety (90) days after the termination of this Agreement, and which relating to the business of the Company or to the Company's actual or demonstrably anticipated research or development, will be promptly disclosed to the Company and will be the exclusive property of the Company. . . .

§ 2.    **Nondisclosure**

§2.1    Upon termination of employment, the Employee will immediately return to the Company all documents, records, drawings, manuals, computer disks, software and any and all other property used or acquired by the Employee during his/her employment with the Company.

§ 2.2    The Employee recognizes and acknowledges that information obtained by him/her during the course of his/her employment with the Company, including trade secrets, business and clients of the Company and its affiliates is confidential…

§ 2.3    The Employee acknowledges the nationwide client base and operation of the Company and its affiliates. Except as directly necessary and required by the Employee's employment with the Company, the **Employee shall not, both during the term of his/her employment with the Company and thereafter use, disclose or communicate to any person, firm or corporation, in any manner, any trade secret, proprietary or confidential information of the Company or its affiliates**. Such information includes but is not limited to, the following: customer lists, product development and marketing plans, strategies and methods; unpublished manuals and drawings; research documents; financial and business records[;] proprietary software; technical and nontechnical data regarding product methods, techniques and processes, company assets and any other confidential or nonpublic information of the business operations, processes or other data of similar nature or description of the Company or its affiliates.

§ 3.0    **Non-Competition and Non-Solicitation Covenants**

The Employee agrees that by virtue of his/her employment with the Company, he/she may have access to trade secrets, confidential information, and proprietary information of Mitek subsidiary including Mitek Corporation. Employee agrees that the confidentiality, non-disclosure, and non-interference

5

provision as set forth herein are equally applicable to these entities' trade secrets, and confidential and proprietary information

**§ 3.1   Covenant Not to Compete.**
The Employee covenants that during the Term of this Agreement and for a one (1) year period following Employee's termination of service with the Company. The Employee will not be involved in any of the following activities, at any location(s) within fifty (50) miles of the Employee's work station, any of the Company's sites, or the sites of its Affiliates: (i)serve a Competitor Company as an agent, consultant, advisor, or employee performing services similar to those services the Employee performed at any time for the Company; or (ii) serve as an owner, partner, officer, director, manager in any venture or entity that duplicates or creates any "competitive market product" to those products and services created by the Company.  For the purpose of this section, a "Competitor Company" shall mean any entity engaged in the design, manufacture, or sale of mobile, residential marine or commercial audio equipment.

§3.2   Non-Solicitation.
Employee will not either directly or indirectly (as an employee, agent, consultant, stockholder, director, partner, or in any other individual or representative capacity), personally solicit or engage any customer or potential customer of the Company with whom Employee had a direct personal contact during the last two years of his or her employment…" "Solicit" means approaching the customer with a view toward selling any product or service competitive with any product or service that the Employee knows is sold by the Company.

19.   The Agreement also contains a provision regarding the governing law that should apply.  The Agreement states:

§ 8.0   **Choice of Law**: "[t]he interpretation and performance of this Agreement will be governed by the laws of the State of Illinois, without regard to principals of conflicts of laws."

### D.   Mitek's Confidential Information

20.   As part of its business, Mitek has expended considerable money and resources to ensure that the confidential information relating to its product design, manufacture, and business sales provide Mitek with significant competitive advantages and economic benefits.

21.   Mitek's confidential information includes but is not limited to:  (a) product development, product plans and strategies, customer and vendor lists, and market and marketing plans, strategies, and methods; (b) unpublished manuals, drawings, research

6

documents; (c) financial and business records; (d) technical and nontechnical data regarding product development methods, techniques and processes, company assets and any other confidential or nonpublic information of the business operations, processes, or other data of similar nature or description of Mitek or its affiliates.

22. Mitek's confidential information is essential to Mitek's continued success in its industry and was created, designed, and developed by Mitek through many years of research and development and expenditure of significant time, costs, and resources, much of which involved Diedrich as he performed his job responsibilities over a 14-year period. This significant investment has enabled Mitek to develop many long-standing business contacts and relationships and create new business and potential customers.

23. Mitek's confidential information generates competitive advantages and economic benefits that others without this confidential information do not have. It would be extremely difficult, if not impossible, to reconstruct this information in a short period of time as it has taken much time, money and effort to develop.

24. Mitek protects its confidential information by, among other safeguards: (a) requiring employees to keep confidential business and customer information confidential; (b) password protecting computers; (c) disabling employee passwords and access upon their termination; (d) limiting access to information; (e) marking documents confidential; (f) requiring employees to sign non-disclosure and non-compete agreements (such as the Agreement at issue in this case); and (g) requiring business partners and vendors to sign non-disclosure agreements.

25. Because of the nature of Mitek's confidential information, the competitive advantage afforded to Mitek because of that confidential information, and the extensive measures Mitek takes to protect its confidential information, that confidential information

7

constitutes trade secrets as defined under the Illinois Trade Secrets act and the Defend Trade Secrets Act.

### E. Defendant Diedrich's Misappropriation of Trade Secrets and Breach of Contract

26. Pursuant to his job duties with Mitek, Diedrich was exposed to Mitek's confidential information and trade secrets, including but not limited to, product features and planned features, product summaries, product drawings, designs, blueprints, and detailed sale reports, pricing sheets, and customer account information.

27. In September 2017, Diedrich resigned from his position at Mitek for a nearly identical position with Mitek's direct competitor, Memphis, in direct violation of the Agreement.

28. Prior to his departure, on or about September 11, 2017, counsel for Mitek wrote a letter to Diedrich reminding him of his obligations under the Agreement and informing him that his employment with Memphis, Mitek's direct competitor, would be a breach of the Agreement. (*See* Ltr. to B. Diedrich, attached hereto as Exhibit C.)

29. The same day, counsel for Mitek sent a letter to Mr. Arthur Fulmer III, President of Memphis and Mr. Nick LoMonaco, Vice President of Memphis informing them that Diedrich had signed the Agreement with Mitek, and therefore his employment with Memphis was in direct breach of the restrictive covenants contained in the Agreement. Memphis was also informed that Diedrich was privy to Mitek's confidential information and trade secrets and that his employment with Memphis would lead to inevitable disclosure of that information. Furthermore, Memphis was informed that by continuing to employ or otherwise engage Diedrich, Memphis would be assisting and encouraging Diedrich to violate his "contractual, statutory, and common duties to Mitek" and further aid and abet his misappropriation of trade secrets. Therefore, Mitek demanded that Memphis terminate Diedrich's employment offer and refuse to employ Diedrich. (*See* Ltr. to Memphis, attached hereto as Exhibit D.)

30. In response, Mitek's counsel received a letter from Jennifer Shorb Hagerman, an attorney for Memphis. (*See* J. Shorb Hagerman Ltr. to M. Tomlinson, attached hereto as Exhibit E.) In that letter, Memphis asserted, without explanation, that Diedrich's "potential employment with Memphis Car Audio would not result in any basis for injunctive relief or other legal relief." Memphis further stated that "in light of the nature and location of Diedrich's work and numerous other reasons," the "non-competition provision in Mr. Diedrich's Employment Agreement is not applicable and/or enforceable."

31. Memphis and Diedrich subsequently chose to ignore Mitek's admonitions and Memphis hired Diedrich.

32. Following Diedrich's departure from Mitek, Mitek began to investigate Diedrich's activities before his departure from Mitek, as well as monitor his post-departure activities. In April of 2017, Diedrich (who was still employed by Mitek at the time) and John Ivey (the current CEO and President of Mitek) attended an electronics fair in Hong Kong. While at the conference, one of Mitek's business partners, EVR, approached Mr. Ivey regarding the possibility of Mitek purchasing the DSP amplifier from EVR for implementation and use in Mitek's product line. Interested in this proposal, Mr. Ivey requested that EVR send Diedrich the information to evaluate the proposal and continue to develop this product.

33. Upon information and belief, in the months following the fair, Diedrich while still employed by Mitek, visited the Mitek facility in Phoenix, Arizona. During this visit, Diedrich viewed and examined a MTX prototype/sample of a new EVR DSP amplifier that Mitek was in the process of evaluating and intending to launch. MTX received the prototype under a Mutual Confidentiality Agreement between it and EVR. Prior to Mitek launching the new product with EVR, Diedrich left. It was later discovered that Diedrich never evaluated or put his work efforts into the proposal on behalf of Mitek. Instead, between the time after

9

Diedrich left in September 2017 and December 2017, he personally reached out to EVR directly and requested that EVR make the same DSP amplifier for Memphis.

34. Diedrich utilized his position within Mitek, and Mitek's confidential information regarding the new amplifier, to attempt to divert business away from Mitek and enable Memphis to easily create a competing product which had features identical to the MTX prototype. Memphis would not and could not have known about this MTX prototype and its features but for Diedrich divulging Mitek's confidential information and trade secrets.

35. Diedrich's acquisition and disclosure of Mitek's confidential information and trade secrets are in violation of the Agreement.

36. By acquiring and disclosing Mitek's confidential information and trade secrets without Mitek's consent or authorization, and in violation of his duty to maintain the secrecy of the same, Diedrich has misappropriated Mitek's confidential information and trade secrets.

37. Diedrich and Memphis have and will continue to use Mitek's misappropriated confidential information and trade secrets, including without limitation, its vendor relationships and confidential and proprietary product designs and strategies, to divert business away from Mitek and otherwise unlawfully compete with Mitek and its products.

38. Mitek has suffered and will continue to suffer harm from misappropriation of its confidential information and trade secrets. The amount of damage it will incur from this misappropriation is difficult to ascertain, and is likely to be irreparable.

## COUNT I

### Breach of Contract
### (against Diedrich)

39. Mitek restates and realleges Paragraphs 1 through 7, 9 through 11, and 13 through 36 as though fully set forth herein.

40. The Agreement constitutes a valid and binding contract between Mitek and Diedrich.

41. Mitek has fully performed all of its material obligations under the Agreement, including increasing and paying Diedrich's salary upon signing the Agreement and continuing his employment for a substantial period of time.

42. The actions by Diedrich detailed above are continuing breaches of the Agreement.

43. While employed at Mitek, Diedrich performed his work from Mitek's office in Winslow, Illinois and while working from home in Oregon, Wisconsin.

44. Upon information and belief, Diedrich performs his work for his new employer, Memphis, primarily from his home in Oregon, Wisconsin, which is less than 50 miles from Mitek in Winslow, Illinois.

45. By accepting the position as Director of Product Development with Mitek's direct competitor, Memphis, and given that his position at Memphis is substantially the same as the Senior Engineering Manager position Diedrich held at Mitek, Diedrich has breached and continues to breach §3.1, the "Covenant Not to Compete" provision of his Agreement.

46. Diedrich also violated and continues to violate § 3.2 of the Agreement by soliciting EVR to request that EVR produce a DSP amplifier with and/or for Memphis, knowing that Mitek already had developed and was preparing to launch a substantially similar, if not identical, product. Indeed, the only way Diedrich knew about this product was because he received confidential information and trade secrets during his employment with Mitek about this product during his trip to Mitek's Arizona facility.

47. Mitek has no adequate remedy at law and is suffering irreparable injury for Diedrich's breach of the Agreement.

WHEREFORE, Plaintiff, Mitek prays for judgment, order and decree in its favor and against Defendant Brad Diedrich, providing the following relief:

    A.    A preliminary and permanent injunction in accordance with Section 4 of the Agreement prohibiting Diedrich from continuing to work for Memphis and enforcing the terms of the Agreement;

    B.    A preliminary and permanent injunction in accordance with Section 4 of the Agreement prohibiting Diedrich from continuing to breach his Agreement by prohibiting him from using or disclosing to any person Mitek's confidential information;

    C.    An award of Mitek's actual damages for Diedrich's breach of the Agreement;

    D.    An award of Mitek's reasonable attorney's fees pursuant to Section 4 of the Agreement;

    E.    Granting Mitek such other and further relief as the Court may deem just and proper.

## COUNT II

### Violation of Federal Defend Trade Secrets Act
**(against all Defendants)**

48. Mitek restates and realleges Paragraphs 1 through 16, 20 through 25, and 32 through 38, as though fully set forth herein.

49. Mitek's confidential information is the result of years of work and substantial expenditure of time, effort and expense, and constitutes trade secrets within the meaning of applicable law, including but not limited to, the federal Defend Trade Secrets Act, 18 U.S.C. § 1839(3) ("DTSA").

50. The confidential information and trade secrets acquired by Mitek provide competitive advantages and economic benefit, both present and future, by virtue of their confidentiality and lack of availability to the general public or direct competitors.

51. Mitek has taken reasonable efforts to protect and maintain the secrecy and confidentiality of its trade secrets.

52. Through his employment agreement with Mitek, Diedrich was on notice that he was not to use his company's confidential information for any purpose other than his work there. (*See* Agreement §2.)

53. Under the DTSA, "an owner of a trade secret that is misappropriated may bring a civil action under this subsection if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C § 1836 (b)(1).

54. The DTSA defines "misappropriation" in relevant part as either: "(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (B) disclosure or use of a trade secret of another without express or implied consent by a person who— . . . (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was—(III) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret. . ." 18 U.S.C. § 1839(5).

55. Further, the DTSA defines "improper means" to include "theft, bribery, misrepresentation, breach or inducement of a breach of duty to maintain secrecy, or espionage through electronic or other means." 18 U.S.C. § 1839(6).

56. As part of his employment with Mitek, Diedrich acquired substantial trade secrets regarding Mitek's current and planned products and its business strategies regarding those products.

57. As part of his employment with Mitek, Diedrich acquired those trade secrets under circumstances giving rise to a duty to maintain their secrecy.

58. Diedrich's new employment with Memphis, Mitek's direct competitor, in a position nearly identical to the one he held at Mitek, has already and inevitably will continue to lead him to rely on and disclose Mitek's trade secrets.

59. Memphis has done nothing to prevent Diedrich from using or disclosing Mitek's trade secrets and in fact, has claimed his employment does not entitle Mitek to any legal relief.

60. Diedrich already has disclosed Mitek's trade secrets when he approached Mitek's manufacturer and supplier—EVR—and inquired whether EVR would agree to work

13

with Memphis to produce a DSP amplifier, a product Diedrich learned of while working at Mitek.

61. Prior to Diedrich's employment with Memphis, upon information and belief, Memphis had not developed or sold this type of product.

62. Diedrich's misappropriation of Mitek's trade secrets and his acceptance of a position at a direct competitor of Mitek, which was nearly identical to the one he held with Mitek thereby causing his disclosure of Mitek's trade secrets to be inevitable, were both malicious and willful.

63. Memphis has conspired with Diedrich in violation of 18 U.S.C. § 1832(a)(5) to effect the misappropriation of Mitek's trade secrets by, among other things, hiring Diedrich for a position substantially the same as the one he held at Mitek, failing to stop Diedrich's disclosure of Mitek's trade secrets, and accepting the benefits of Diedrich's misappropriation and inevitable disclosure of Mitek's trade secrets.

64. As a direct and proximate result of the Defendants' misappropriation of Mitek's trade secrets and Diedrich's inevitable disclosure use of those trade secrets while employed at Memphis, Defendants have damaged, and, unless restrained and enjoined, will continue to damage and threaten damage to Mitek in the form of, among other things, lost profits from product sales, the exact amount of which are extremely difficult to determine.

65. Among other relief, the DTSA provides injunctive relief to prevent any actual or threatened misappropriation. 18 U.S.C. § 1836(3)(A).

66. The harm which Mitek will suffer if Diedrich and Memphis are not enjoined far outweighs any harm Diedrich would suffer from the issuance of injunctive relief.

WHEREFORE, Plaintiff, Mitek prays for judgment, order and decree in its favor and against Defendants, providing the following relief:

    A.    A preliminary and permanent injunction prohibiting Diedrich from continuing to work for Memphis due to the inevitability of his disclosure of Mitek's trade secrets;

    B.    A preliminary and permanent injunction prohibiting Diedrich and those acting in concert with him from using or disclosing to any person Mitek's confidential information and trade secrets;

    C.    An award of Mitek's actual damages for misappropriation of confidential information and trade secrets as provide for in the DTSA;

    D.    An award of exemplary damages for misappropriation of confidential information and trade secrets as provide for in the DTSA;

    E.    An award of Mitek's reasonable attorney's fees pursuant to 18 U.S.C. § 1836(b)(3)(D);

    F.    Granting Mitek such other and further relief as the Court may deem just and proper.

## COUNT III

### Violation of Illinois Trade Secrets Act
### (against Diedrich)

67. Mitek restates and realleges Paragraphs 1 through 16 and 20 through 25, and 32 through 38, as though fully set forth herein.

68. Mitek's confidential information and trade secrets are the result of years of work and substantial expenditure of time, effort and expense and constitutes trade secrets within the meaning of applicable law, including but not limited to within the meaning of the Illinois Trade Secrets Act, 765 ILCS 1065/1 *et seq.* ("ITSA").

69. The confidential information and trade secrets acquired by Mitek provide competitive advantages and economic benefit, both present and future, by virtue of their confidentiality and lack of availability to the general public or direct competitors.

70. Mitek has taken reasonable efforts to protect and maintain the secrecy and confidentiality of its trade secrets.

71. Through his employment agreement with Mitek, Diedrich was on notice that he was not to use his company's confidential information for any purpose other than his work there. (*See* Agreement §2.)

72. For the purposes of the ITSA, misappropriation' means:

> (1) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means or (2) disclosure or use of a trade secret of another without express or implied consent by another person who: (A) used improper means to acquire knowledge of the trade secret; or (B) at the time of disclosure or use, knew or had reason to know that knowledge of the trade secret was: (I) derived from or through a person who utilized improper means to acquire it; (II) acquired under the circumstances giving rise to a duty to maintain its secrecy or limit its use; or (III) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use.

765 ILCS 1065/2 (b).

73. Under the ITSA, "'improper means' includes theft, bribery, misrepresentation, breach or inducement of a breach of confidential relationship or other duty to maintain secrecy or limit use, or espionage through electronic or other means." 765 ILCS 1065/2 (a).

74. As part of his employment with Mitek, Diedrich acquired substantial trade secrets regarding Mitek's current and planned products and its business strategies regarding those products.

75. As part of his employment with Mitek, Diedrich acquired those trade secrets under circumstances giving rise to a duty to maintain their secrecy.

76. Diedrich's new employment with Memphis, Mitek's direct competitor, in a position nearly identical to the one he held at Mitek, has already and inevitably will continue to lead him to rely on and disclose Mitek's trade secrets.

77. Memphis has done nothing to prevent Diedrich from using or disclosing Mitek's trade secrets and in fact, has claimed his employment does not entitle Mitek to any legal relief.

78. Diedrich already has disclosed Mitek's trade secrets when he approached Mitek's manufacturer and supplier—EVR—and inquired whether EVR would agree to work

16

with Memphis to produce a DSP amplifier, a product Diedrich learned of while working at Mitek.

79. Prior to Diedrich's employment with Memphis, upon information and belief, Memphis had not sold this type of product.

80. Diedrich's misappropriation of Mitek's trade secrets and his acceptance of a position at a direct competitor of Mitek, which was nearly identical to the one he held with Mitek thereby causing his disclosure of Mitek's trade secrets to be inevitable, were both malicious and willful.

81. As a direct and proximate result of Diedrich's misappropriation of Mitek's trade secrets and Diedrich's inevitable use of those trade secrets while employed at Memphis, Diedrich has damaged, and, unless restrained and enjoined, will continue to damage and threaten damage to Mitek in the form of, among other things, lost profits from product sales, the exact amount of which are extremely difficult to determine.

WHEREFORE, Plaintiff, Mitek prays for judgment, order and decree in its favor and against Defendant Brad Diedrich, providing the following relief:

- A. A preliminary and permanent injunction prohibiting Diedrich from continuing to work for Memphis due to the inevitability of his disclosure of Mitek's trade secrets;

- B. A preliminary and permanent injunction prohibiting Diedrich and those acting in concert with him from using or disclosing to any person Mitek's confidential information and trade secrets;

- C. Compensatory damages in the amount to be determined at trial pursuant to 765 ILCS 1065/4(a);

- D. Exemplary damages pursuant to 765 ILCS 1065/4(b) in an amount equaling twice the compensatory damages;

- E. Reasonable attorney fees pursuant to 765 ILCS 1065/5;

- F. Such other relief as the Court deems just and proper.

## COUNT IV

### Tortious Interference with Contract
(against Memphis)

82. Mitek restates and realleges Paragraphs 1 through 7, 9 through 11, and 13 through 36, as though fully set forth herein.

83. Diedrich is employed by Memphis as their Director of Product Development since September 2017.

84. Prior to the date on which Diedrich became employed by Memphis, Memphis was made aware, at least through a letter from Mitek's counsel dated September 11, 2017, of Diedrich's contractual obligations not to work for a competitor of Mitek and to protect and not disclose Mitek's confidential information and trade secrets. Indeed, Memphis knew the specific terms of the Agreement, because it received a copy of it from Mitek's counsel on September 11, 2017.

85. Memphis knowingly and intentionally ignored those terms and hired Brad Diedrich despite the obligations imposed by the Agreement.

86. Through its conduct, Memphis intentionally interfered and continues to intentionally interfere with Mitek's rights under the Agreement, including its right to prohibit Diedrich from working for a competitor for a period of one year from the date of his departure, and its right to be free from unfair competition through Diedrich disclosing and using its confidential information and trade secrets.

87. Memphis is further aiding and abetting Diedrich's breach of his contractual obligations to Mitek by agreeing to employ him and accepting the benefits of Diedrich's misappropriation and unlawful use and disclosure of Mitek's confidential information and trade secrets.

88. As a direct and proximate cause of Memphis's intentional interference, Mitek has been damaged and will continue to be damaged through Memphis's unfair competition

with Mitek and the loss of its confidential information and trade secrets to a direct competitor.

89. Memphis' tortious interference with the Agreement was deliberate, willful, and malicious.

WHEREFORE, Plaintiff, Mitek prays for a judgment, order and decree in its favor and against Defendant Memphis, providing the following relief:

A. A preliminary and permanent injunction prohibiting Memphis and those acting in concert with it from (i) employing Brad Diedrich and (ii) interfering with and diverting any business from Mitek;

B. Awarding Mitek actual damages for Memphis's tortious interference with contract;

C. Awarding Mitek punitive damages for Memphis's willful and malicious conduct;

D. Imposition of a constructive trust and disgorgement of profits received by Defendants' as a result of the Defendants' wrongful conduct; and

E. Granting Mitek such other and further relief as the Court may deem just and proper.

## COUNT VI

### Unjust Enrichment
### (in the alternative to Counts I and IV)
### (against all Defendants)

90. Mitek restates and realleges Paragraphs 1 through 7, 9 through 11, 13 through 36, as though fully set forth herein.

91. The Defendants' misconduct, as alleged above, has and will continue to allow Diedrich and Memphis to compete unfairly with Mitek, and to take advantage of, among other things, Mitek's confidential information and trade secrets, all of which Diedrich and Memphis otherwise would not have knowledge or reason to know.

92. Based on the Defendants' misconduct, Diedrich and Memphis have been unjustly enriched because, among other things, they have been able to quickly and unfairly gain valuable knowledge of Mitek's current and future product information, plans and strategy,

including but not limited to product designs, blueprints, prototypes and samples without expending the time, effort, expense, and resources that Mitek has expended over many years.

93. As a direct and proximate result of the Defendants' unjust enrichment, Mitek has suffered and continues to suffer severe and irreparable harm, damage, and injury.

WHEREFORE, Plaintiff, Mitek prays for a judgment, order and decree in its favor and against Defendants, providing the following relief:

A. A preliminary and permanent injunction prohibiting Memphis and those acting in concert with it from (i) employing Brad Diedrich and (ii) interfering with and diverting any business from Mitek;

B. Awarding Mitek actual damages for Memphis's tortious interference with contract;

C. Awarding Mitek punitive damages for Memphis's willful and malicious conduct;

D. Imposition of a constructive trust and disgorgement of profits received by Defendants' as a result of the Defendants' wrongful conduct; and

E. Granting Mitek such other and further relief as the Court may deem just and proper.

## JURY DEMAND
**(all claims)**

Mitek demands trial by jury on all the claims for damages.

Dated: February 26, 2018               Respectfully submitted,

                                       Mitek Corporation


                                By:    /s/ Michael Munley
                                       One of its attorneys

Michael P. Tomlinson  (ARDC # 6279930)
Vincenza LaMonica Tomlinson (ARDC # 6283325)
Michael Munley (ARDC # 6309743)
TOMLINSON LAW OFFICE, P.C.
8501 W. Higgins Road, Ste. 420
Chicago, IL  60631
Phone:  (312) 715-8770
Fax:  (866) 625-7089
Email: mtomlinson@tomlinson-law.com; elt@tomlinson-law.com; mmunley@tomlinson-law.com